You may proceed. May it please the Court, Shiloh Hernandez for Appellant Conservation Groups. With me is Michael Saul. I intend to reserve three of my minutes for rebuttal. We have ceded seven minutes to amicus United States. Counsel Rachel Herron will argue after me. So please watch your time because if you use up amicus' time, it's used up. I'll do my best, Your Honor. Federal appellate courts unanimously agree. Endangered Species Act and NEPA suits seeking prospective relief against federal agencies should not be dismissed under Rule 19. Here, the group seek prospective relief against federal defendants for violating these keystone federal laws and issuing a federal approval to extend operations of a strip mining coal plant that are causing widespread off-reservation harm, including sickening communities, emitting tens of millions of tons of greenhouse gases, and pushing native fish to the brink of extinction. I thought the agencies had already approved the various licenses and the like. Is that right? They approved the lease amendment, the rights of ways, the two smack permits. Isn't that correct? They're approved in the NTAC. I don't know how you pronounce that acronym. But the native entity has gone forward and made investments and gotten loans and the like. Am I wrong about that? That's right. The federal agencies approved the extension of the mine and extension of the lease and the right of ways. So there was a 2015 ROD, Record of Decision, that authorized all of these various permits and approvals. Is that right? That's right. And that's the record of decision that the conservation groups are challenging here. And so it's not prospective because you want to undo the permits and approvals that were already made. It would withdraw all of those who would vacate those. That's how I understood your argument. No, our argument is precisely that it is prospective. The question of prospective versus retroactive. So they can continue going forward with the current ROD because you don't want to touch that. We want to enjoin the federal agencies from allowing further operations of the expanded portion of the mine or the lease and right of ways pending federal compliance with the Endangered Species Act in NEPA, which is exactly the type of prospective relief that this court authorized and found would not run afoul of Rule 19 in Conner versus Burford. Because as in Conner versus Burford, we've sought no relief against NTEC. We're not trying to challenge the lease between NTEC and Arizona Public Service. We're just seeking relief with respect to federal agencies. And that's the distinction that this court made in Conner and that the Supreme Court has developed from the time of Ex Parte Young to the Verizon versus Public Service Commission of Maryland case to address questions of subnational sovereignty. That it's OK to seek prospective relief, but not retroactive relief. And this is the point, Judge Ikuda, that I'd like to make on that. Is that in Edelman versus Jordan, the Supreme Court sharpened this distinction and said what is properly characterized as prospective relief is relief that is going forward and that can be resolved with compliance of the law. Whereas retroactive relief is where a party seeks money damages for a past breach of the law. Here, the conservation groups are seeking to just enjoin operations pending compliance with the law. And the Supreme Court kind of put a finer point on that in Verizon, where they said even asking that a past decision be declared unlawful and enjoined pending compliance with the law counts as prospective relief pursuant to the court's Ex Parte Young jurisprudence. Isn't your ultimate goal to seek the termination of the extension of the lease, the need to have the lease extended in order to continue the mining operations, correct? They need the federal approvals here for the lease. I'm sorry. I'm just trying to understand the dichotomy between your retroactive and your prospective relief as to what you're trying to ultimately accomplish. I take it you do not want to accomplish the officiation of the mining operation, or maybe you do. I don't know. I thought that was the goal, was to stop the mining operation, basically shut down the power plant. Our client's goal isn't to harm, attack, or shut down the power plant. Our goal is to protect the communities who are being sickened and protect the endangered species that are being pushed towards the brink of extinction. Cazzoli indicated that that sort of action was purely private. They distinguished Connor and said it was just a disagreement about what was in the best interests here of the Navajo Nation, and therefore said that the public rights doctrine didn't apply. Is this analogous? Because it's a native organization which just disagrees about operating the mine and the power plant? No, for a number of reasons. We pointed four distinctions out in our briefs, Your Honor. The first and most critical is that Cazzoli, there, the plaintiffs sought to cancel a settlement agreement, a contract. And that's the keystone for compulsory joinder, the whole idea developed at common law to protect private contractual rights. In Connor, by contrast, the plaintiffs didn't seek to challenge the underlying lease. That's the case here. We're not challenging a contract, as in Cazzoli. We're challenging federal approval of a lease, as in Connor. So the case is analogous to Connor. But, Your Honor, So a lease isn't a contract? You're saying it's a special type of contract, so it's distinguishable on that ground? No, no, Your Honor. The distinction is that in Connor,  They sought relief just against a federal approval of the lease. And it's kind of a fine distinction, but that's the distinction that's very fine. Yes, very fine, because the government may allow them to go forward with their operations. But in Cazzoli, it was similar in that it had been issued by the government agency, right? There was an agreement between the government agency and the operators. Am I wrong about that? With respect, Your Honor, yes. In Connor, what the court said, it said, what we're doing here is we're enjoining the federal defendants. The lease maintains its lease structure. Any leasehold rights are still valid. We're just enjoining surface-disturbing activities pending the federal government's compliance with federal law. And that's what we're doing here. We're not touching the lease. There's no request with anything with respect to the lease in this case. We're just seeking to enjoin the federal approval of surface-disturbing activities pursuant to the lease pending compliance with the law. So the BIA approval of the lease is not part of your challenge. Is that correct? Yes, not the lease, but the federal approval. It's the federal action that we're challenging, not the private lease. But you can't go forward with it because you don't have a lease without BIA approval. I guess I'm not understanding that. They can have the lease. That's a private contract. But they can't operate the lease and do ground-destroying activity pending approval by BIA. And the point here is that Congress decided the ultimate decision about operating a lease on tribal land rests with federal agencies, with the Department of Interior. And the decision here that's being challenged isn't a tribal decision. It's a federal agency decision. And that's why I think the court need not get to the public interest doctrine immediately because the case can be resolved under controlling Ninth Circuit precedent, which is Southwest Center versus Babbitt. There, the court held in a very similar case that a federal record of decision that benefits an absent tribe, when it's challenged, the federal agency that made the decision can adequately represent the interests that the absent tribe had in that federal agency decision. And the reasons are twofold. First, because the federal government has a fiduciary trust obligation to the tribe, which the court has repeatedly recognized starting with the Supreme Court decision in Heckman to the present. They have a duty to represent the tribe's interest. So I'm going to interrupt you with my apologies. Or maybe I need not apologize, I guess. But I think I have a sense of your conceptual distinction and the perspective and the retrospective and all these cases you cite. But realistically, I don't have a practical handle on if you're successful in your challenge, will the mining operation be terminated or not? The mining operation can't be terminated. It could be, in the expansionary, it could be enjoined pending compliance with the law. But tell me what that means, realistically. It's enjoined, you're not able to continue mining, right? Until what happens? Until the federal defendants comply with NEPA and the ESA. In theory, that means they produce a new EIS and a new biop. That will take, it'll be interim relief for about a year. That's how long. And the new determination can do what? Can it enforce some regulations or more environmental restrictions can be imposed upon the operation of the mine? Is that what you're seeking? Yes, we're seeking. Endangered species, you have to consider that and all that. Provisions that protect endangered species in public health. But you're not seeking to end the rights of the Navajo Nation to continue to operate their mine. That's not what you're seeking to do. No, we're just seeking to enjoin approval of the mine. The relief on the ground would be that in the expansion area they would have to stop mining for a temporary period of time but they would retain their ability to mine if the federal government approves the action. That will take some period of time for that to unwind. They get to have a new environment. And the PAC statements, that's what you're looking for, I guess, basically. Yes, Your Honor. And I don't want to eat up Amiki's time. I'd just like to conclude briefly by noting that Professor Jeffrey Hazzard famously referred to Rule 19 as a procedural phantom that haunts the federal judiciary and it should be laid to rest. We're not asking the court to- Can I ask one thing about APS and whether it could represent the tribe's interests? Did anyone discuss that in the district court? No, not that I recall. And Your Honor, here we're just asking the court to follow its controlling precedent, which are Southwest Center and Washington v. Daly, which are directly on point with this case in which neither the district court nor NTAC has attempted to distinguish. So we'd request that the court- I'm sorry, I meant to ask whether they could represent- No, nevermind. Okay, go ahead. I apologize. We just asked that the court reverse and remand. And yes, I think Arizona Public Service has a parallel interest with NTAC and can represent their interests as this court held in Southwest Center. Private parties- But you didn't argue that, so I'm just a little unsure what we should do with that at this point. Actually, we did, Your Honor, and I could point you to our points in the district court and on appeal where we did make that argument. Oh, okay. That's what I thought I was trying to ask, whether that had been raised in the district court. I'm sorry. Yes, we raised that point. The district court did not address it. And where did you raise that? Can you give us a record site? I can on rebuttal if I may, Your Honor. All right. All right. Thank you. May it please the court. Rachel Heron on behalf of the United States. United States believes that this court should reverse the order below because it would render unreviewable an entire class of federal agency actions that Congress made subject to review under the Administrative Procedure Act. So we supposedly have a wall of precedent saying that when a tribal entity can't be joined, then it should be dismissed. So we also have those precedents to deal with. How do they interact with precedents about environmental challenges? This is how they interact, Your Honor. While there are many cases from this circuit that dismiss under Rule 19B, in light of a tribe's and absent tribe's sovereign immunity, there are none that do so in a APA action like this one. And when I say like this one, I mean one that has three salient aspects. Those are, first, that it is a challenge solely to the federal government's compliance with NEPA and ESA procedures. Second, that the relief sought would solely set aside government action and not seek to- It would basically stop their operations if they don't have their SMACRA permit or their lease amendments, et cetera. And they claim or they argue that they would not be able to repay their loan and they might lose the mine. So obviously have a huge impact on their operations going forward. A very different interest than what the government has. It's certainly an impact. The government doesn't mean to downplay the fact that the collateral consequences of setting aside government action in this case for NTEC could be significant. However, what matters here, and this goes back to a point that came up previously with regard to the fineness of the distinction between setting aside government approval of a lease and destroying or canceling the lease itself. Respectfully, we don't believe that that is actually that fine a distinction. And we think the 10th Circuit explained why well in the many goats decision. The fundamental difference is that when you are only setting aside the government action and only because the government failed as is alleged here to tick off certain analytical components that it needed to consider in doing the NEPA and ESA work, there is no reason that the lease as it exists as the tribe negotiated for it could not spring back to life in a sense and be approved again in the future when the government has completed its work. Certainly there are impacts that occur in the meantime and we don't mean to downplay them, but the document itself is not destroyed forever. And even to the extent that we acknowledge that that is a somewhat fine distinction, I think that distinction needs to be considered in light of what's on the other side of the balance here. And the other side of the balance is that if this kind of action can't go forward  then we have essentially taken an entire class of actions which Congress subjected to NEPA and to ESA, there's no exception to those laws that apply to the tribal land actions at issue here, and essentially immunized them from all judicial review. Is that a function of the sovereignty? Their argument is that it's a function of their sovereignty and if they aren't able to exercise sovereign immunity then this is basically an end run to attack their operations in a way that it's not really allowed. I mean, isn't that just a function of sovereign immunity? You can't bring your action? We think that when the challenge is against the federal government's compliance with federal environmental procedures, the true sovereign immunity question is the government sovereign immunity which has been waived in the APA. In this context, while there are certainly going to be collateral impacts on the tribe, there are always going to be collateral impacts on an entity, whether it be tribal, private, or otherwise. That's why we have Rule 19, right? That is why we have it. That's the purpose of Rule 19, to anyone who claims an interest can go into court and represent their rights. Well, but so I think that then even if we looked solely at the terms of Rule 19 itself and simply apply the Rule 19 cases and put public rights aside, I think if we apply the Rule 19 jurisprudence as it exists in this circuit, we clearly see that we have a situation in which although there is an interest, that interest is adequately represented by the government. It seems like you're saying inconsistent things. So on the one hand, you're basically arguing it's a public interest that we don't have to represent the tribe's interest, and then now you're about to say the government is representing the tribe's interest. No, and let me clarify, Your Honor, because we don't mean to say that at all. The public rights exception is a, simply goes to whether we're looking at Rule 19 at all. When we are assessing what the interest is and whether that interest is adequately represented, we can only do so within the context of what is the challenge. The challenge here is to whether the federal government complied with certain procedures. The federal government has the primary interest in defending the legality of its own actions. That might be that you agree, okay, there's part of this we should do again. Let's be really sure we did it all right, and you do something again. But the tribe might not want you to do that if it would stop the operation in the meantime. So I don't really see how the interests are exactly the same. Well, I think, Your Honor, respectfully, this court's decision in Southwest Center cuts off that kind of inquiry. The question is, the baseline that Southwest Center sets is that the government is an adequate representative in these kind of NEPA ESA questions unless there is a present conflict. Here, there is no present conflict. I see you on different sides of the table, however. Well, with regard to the Rule 19 issue only, which Southwest Center also points out, a difference in opinion on whether the Rule 19 dismissal is appropriate is not a basis for finding the United States is not an adequate representative on the merits. Can you explain why the government is here as an amicus instead of having filed briefs as respondents? I don't understand what's going on procedurally here. Certainly. So the government was obviously defendant below, and we took the same position below that we're taking now. The reason that we filed as an amicus is that we did not file an appeal of our own, and as a non-appellant who nonetheless felt that the district court's decision should be reversed, we felt that it would be inappropriate to file an appellee brief, and so we instead structured our participation as amicus. But you're also, you sort of are, I mean, I think there were specific federal defendants before, and now you're the United States. Is there some change of who the party is that you're claiming to be? No, the United States is speaking on behalf of the agencies that were the defendants below, and as I said, the arguments that the United States makes in this appeal are precisely the same ones that the defendants below made in their own voice below. You wanna save time for rebuttal? Yes, I would not want to get involved, take any more away from the rebuttal. We would simply ask this court to reverse in light of the potentially enormous impacts on the ability to get NEPA and ESA review. Thank you. Thank you. Good morning, and may it please the court, I'm Aukian Ingraham here on behalf of the Navajo Transitional Energy Company, and NTEC is the right way to say it, Judge Ikuto. Here also is Paul Spruhan on behalf of the Navajo Nation DOJ. Also, Stacey Van Belleghem is going to take the second seven minutes for APS, Arizona Public Services. Please watch the clock. I will do my best, Your Honor. So, we are talking about nothing less here than the solvency of the Navajo Transitional Energy Company, and that makes, and the Navajo Nation, and that makes NTEC a required party under Rule 19, and that means no one else can protect NTEC's interests here, not the government, not APS. NTEC is also an indispensable party, and has to be dismissed due to sovereign immunity, and I think you, Judge Friedland, and you, Judge Ikuto, are both very familiar with these issues from your time and decisions. We don't get many of those cases in Brooklyn. Maybe not, Judge, maybe not. So, to start off with distinguishing, I want to distinguish right off the bat the Southwest Center for Diversity. It's distinguishable because in that case, the district court did not question the ability or the willingness of the United States to represent the nation adequately, and that is a big deal. It also did not address the failure of the United States and their responsibility to the Navajo Nation, and I can give you a list of cases as long as my arm where the United States has failed in its trust responsibility to not just the Navajo Nation, but to other nations as well. The district court seemed to think that the federal defendants couldn't represent NTEC, but then didn't explain what the conflicts, anticipated conflicts were. Could you explain what those anticipated conflicts were? I'd be happy to, Your Honor. I think what the district court said is that they don't see a divergence of interest here, but as you have already pointed out, the federal government is not bound to keep NTEC's interest or the Navajo interest at its forefront. It can decide not to pursue a particular defense at any time where NTEC is left with no remedy when this, again, will take away a third of the Navajo Nation's operating budget, 600 jobs. It will have devastating and disastrous consequences for the nation. The government quite simply doesn't have those devastating and disastrous consequences. Their budget isn't gonna be taken away. Their people are still gonna have jobs. Do you see a conflict, though, in what arguments might be made? Is there, at this point, is that something that you can anticipate or you've seen evidence of? Well, what I can tell you about that, Judge, is in the past, the government has decided, for example, to withdraw a permit on which, or withdraw a biological opinion on which mining permits are based on. That leaves NTEC with absolutely no remedy. We don't know what they're gonna do. We can't control what they're gonna do, and they can change their mind at any time. So it could be that they would decide that they were gonna issue another biological opinion. NTEC and the Navajo, that would be disastrous for NTEC and the Navajo to have to shut down the mine at any time. It seems that APS's interests are more aligned with NTEC, and I don't really understand why we don't have an analysis of that issue. Can you speak to that, whether APS could have represented the interests? I can speak to that, Judge. So the Navajo Transitional Energy Company is an arm of the Navajo Nation. That's undisputed, it's all over the record. In part, that means that we don't just have an economic interest in this. This is also about the governance of natural resources, and the Navajos say that they look forward seven generations, not just one. So when looking forward and controlling your own natural resources and making decisions based on those natural resources, that's not the same as a corporation making corporate decisions and business decisions. So APS, that would be like saying targets and control of the U.S. government, that there's a different standard that APS is gonna use to make its business decisions than an arm of the Navajo Nation is gonna use to make its natural resource and governance decisions, which is what this is. Do you agree that the issue about whether APS was an adequate representative was before the district court? I'm gonna let APS counsel answer that. I believe that came up later in the briefing, is my recollection. No, I will say, NTAC intervened for the limited purpose in the district court to file this motion to dismiss based on sovereign immunity. Nobody opposed that motion. There's some of the same analysis, obviously, in that motion for intervention as there is in that motion to dismiss. So, moving on, and then I wanna make sure to give APS some counsel, some opportunity. The district, I wanna also address this issue of retrospective and prospective relief. I think the judges have asked the correct questions. Why, how could this possibly be prospective relief? It's not. It's retrospective relief that seeks to undo decisions that the federal government has already made and NTAC has been relying on for over three to four years. So, to characterize this as prospective relief is a misnomer and doesn't follow the wall of circuit authority, which I really like that line, Judge Akuta, because the plaintiffs in this case have chosen a path that runs right into that wall of circuit authority. It seems that the district court didn't analyze the public rights exception issue. So, what do we do about that? So, the district court, I think you're correct, did not analyze the public rights exception, and part of why they didn't analyze the public rights exception is because of this wall of circuit authority, and I think that's what Judge Logan says in his opinion. And we know from the cases cited in white, the seven cases that make up that wall of circuit authority, that those cases really inform the Rule 19B analysis and really say that sovereign immunity can be the most important factor when you're looking at a dismissal, and that's right in line with Pimentel, the 2008 U.S. Supreme Court case that really makes sovereign immunity the most important factor here. And sometimes, sovereign immunity will require that cases be dismissed, and the court has looked at the public rights exception in the Ninth Circuit just solely on a very limited basis, and Connor v. Burford is a really narrow exception. So, and I think it's worth pointing out, which I think you know well, that the public rights exception really hasn't been applied since Connor v. Burford over 30 years ago. Does that answer your question, Judge? So I have a question. I'm just trying to get a practical grasp on this. I know there are a lot of issues out there of a legal nature, but ultimately, basically, you want the case to be aborted and not give the plaintiffs the opportunity to exercise what otherwise would be their rights to challenge governmental activity. I take it when the Navajo Nation wanted to get all of its permits to operate the mines, that it waived its sovereign immunity in order to go through the environmental impact statement and the environmental process. They wanted that to happen, because if that did not happen, they could not have gotten the permissions to go forward with their mining operations. Now they want to do the opposite. They want to use their sovereign immunity to avoid having to deal with that type of review. Is there anything inconsistent? The Tenth Circuit seems to say this is sort of wanting your cake and eating it at the same time. What do you make of that? The Navajo Nation and ENTEC performed a limited waiver of sovereign immunity so that the government could specifically enforce environmental laws so this permit could be... When it was in their best interest, they waived it, and now they choose not to waive it. That's okay under the law, right? It's not inconsistent with the law. Rule 19 allows the Navajo Nation and ENTEC to use its sovereign immunity to protect its determinations as a sovereign nation, including what it's going to do for its natural resources. So to have a very limited waiver of sovereign immunity, the tribe can do that. It's the tribe's immunity to waive. It's not others' to take away. And there are two ways to deal with tribal sovereign immunity and Congress certainly has authority to abrogate tribal sovereign immunity and hasn't chosen to do so in this case. So again, I want to be clear that it doesn't make logical sense on the one hand to argue that the government can represent its own interests and then come to the table without identifying what the Navajo or ENTEC's interests are in the briefing and then say that those interests can also be represented. I think in the briefing, it's not clear that the government even knows what the Navajo's interests are or acknowledges what the Navajo's interests are in this particular case. I think the Ninth Circuit has had 40 years to adopt mini-goats and hasn't chosen to do so and instead has chosen to put up this wall of Ninth Circuit authority where under these circumstances, it would find that sovereign immunity would control here under the Rule 19b analysis. Mini-goats is a little bit different in that it was talking about not a mining operation that was already in place but prospective uranium mining, which is a little bit different than the situation where we have now where a mine that's been operating for many, many years and is really the backbone of the Navajo economy and the Navajo Nation unemployment rate hovers at 50% where that mine would be shut down, causing economic devastation. So the interests are certainly different in this case and certainly more drastic. The Tenth Circuit has also- The rule you're asking for though, I think would exempt, it would basically mean you couldn't bring an environmental challenge when a tribe was involved in having a vested interest in the operation, whether it's expansion or new or anything. Once the permit is granted and things start, I think it is true that an environmental challenge couldn't be brought unless the tribe was willing to cooperate and be a party, which I don't know why they would. So I think we would have to concede that tribal sovereign immunity and Pimentel would say that maybe there's not a judicial remedy, federal judicial remedy, but that doesn't mean that there's not other remedies for plaintiffs and plaintiffs also had a full opportunity to comment on the process below during the comment period before the permits were issued. Also, there's no evidence in the record that plaintiffs have ever pursued any of the remedies available on the Navajo Nation, which the Navajo Nation has its own Environmental Species Act. The Navajo Nation has its own environmental laws. The plaintiffs are not limited in their remedies that they can seek on the Navajo Nation. And with that, I'm going to cede a little bit of time to APS. Thank you. There are no more questions. Okay. May it please the court. I'd like to begin, if I may, by addressing Judge Friedland's question about whether APS could be an adequate representative. And the answer to that question is no. This was before the district court. APS filed a very short statement in support of NTEC's motion to dismiss and stated in that response that APS is not an adequate representative. And it's essentially for at least two reasons, or three, three reasons. First, APS lacks the expertise to defend the mining approvals that are challenged here. APS does not own any mines or operate any mines. So from a substantive perspective, would not have the expertise to defend those approvals. More fundamentally, it would be extraordinary, as Ms. Ingraham said, for a court to force a tribe to rely upon an unaffiliated private corporation to defend tribal sovereign interests. The plaintiffs, in suggesting that APS would be an adequate representative, cited no precedent of that nature, and I'm not aware of any. And the third is that APS really can't speak to the effect of the relief that plaintiffs seek here on the Navajo Nation's economic decisions, its sovereignty. That's just not something that APS as a private corporation could represent. And so there's a necessary element there that only NTEC alone could represent. And so does that answer Your Honor's question? I still wasn't totally clear, though, about whether the plaintiffs had argued about this. It sounds like you filed a brief, but it doesn't really seem like the district court grappled with it, so I'm just a little bit confused about what happened. I can't recall whether plaintiffs raised it in the district court. We might have to follow up with that response, Your Honor. If I may, I'd like to also clarify one aspect of the discussion early on with respect to the approvals that are challenged here. And so the approvals include not just the lease that APS and the Navajo Nation have for the Four Corners Power Plant, which, as Your Honor's pointed out, requires government approval to be valid. But the approvals also include two approvals related to the SMACRA permits for Navajo Mine. This is actually outlined in APS's brief at page 12, the approvals at issue here. One of those SMACRA permit approvals is for the expansion, as Mr. Hernandez pointed out, but the other of the approvals was actually a renewal of the overall SMACRA permit that permits all mining on Navajo Mine. So the question is, if that permit were set aside by the court, if the court granted the relief that plaintiffs seek, that would take away the legal authorization for ENTEC to mine in that location, throughout the entire mine. So if the 2015 rod were vacated or set aside, would that mean that all mining operations in that area would have to cease? That means there would be no legal authority for ENTEC. Carefully said. And how would that affect the power plant? So that would take away the only supply of coal for the power plant. This is what's called a mine mouth operation. There's no other way for the Four Corners Power Plant to receive coal, so the power plant would shut down as well. How long did it take to get the approvals in the first place? So the actual environmental review process under NEPA took a total of three years, but there were processes that began well before that. So for instance, for the lease that APS has with the Navajo Nation, negotiations with the Navajo Nation preceded any of these approvals because it wasn't until there was agreement between the parties on the terms of that agreement that it was submitted to the Bureau of Indian Affairs. And so three years from the notice of intent to prepare an EIS to the record of decision in this case, but several years before that as well. And what do you think we should do with Connor B. Burford, which is to say that until we know what would happen with the analysis, we don't really know that anything would be a problem? Well, so with Connor, I would point out the fact that it was a very different procedure, I mean, posture there where, well, first of all, there were no tribal sovereignty rights at issue. And so, I mean, that really is a dispositive thing in the case law in the Ninth Circuit. But even in that case, the parties, the absent parties there waited two years to file their motion after the court had already decided the issue and issued a final judgment. And even in that case, the court, the Ninth Circuit viewed the district court's order as not actually setting aside the leases. And so you have a very different posture here where this clearly is setting aside the leases there, the mining had not yet, or the development had not yet occurred. And so essentially the court was maintaining the status quo. Whereas here, these operations have been undertaken, for over 50 years, the legal approvals and authorizations for continued operations have prompted the parties to take additional investment, so to be disrupting. The district court wouldn't have the discretion to allow the operations to continue while the need for review happened? I mean, do we know that wouldn't be status quo in the meantime? Well, so there would still be, I guess if your question is, would there be a way to avoid prejudice? There's simply no way to avoid prejudice because this legal authority has already been granted to NTTAC and plaintiffs seek to take it away. And so even if a court were to, for instance, remand the decisions to the agency and to make clear that the decisions were still in place, the agencies having reopened the decisions could choose not to reissue the decisions, or they could choose to impose additional mitigation under either the NEPA or the Endangered Species Act that could be costly and burdensome and could potentially make operations infeasible, continued operations. But are they, as plaintiffs challenging the biological opinion, the Endangered Species Act, as well, and is that one of the approvals that they're asking to be vacated and set aside? Yes, Your Honor. So literally, if there was operations without the biological opinion, you would be at risk of criminal felony offenses. Yes, Your Honor. The biological opinion found that the continued action would not jeopardize the continued existence of the species, but it did find that there would be what's called take under the Endangered Species Act. And so part of the biological opinion was an incidental take statement that gave legal authorization for the activities to continue without violating the Endangered Species Act. So that's an excellent point. There are no further questions? No, we thank you for your argument. Thank you. And we'll hear rebuttal. Thank you, Your Honor. First, Judge Fiesland, to your point about raising the issue of APS as representation, in the district court we did on document 57 at page 10, we said, quote, the presence of APS whose interest in the plant mirrors NTAC's interest in the mine further assures adequate representation. And we cited Southwest Center where this court said that the presence of private entities could represent tribal interests. And federal there, right? Yeah, there was the same postures here. In fact, federal agencies and private parties could represent the tribe's interest in the federal decision. Judge Fiesland, you also asked the question of my friend on the other side about the potential conflicts. And the response was, we're not sure there are potential possible conflicts. This court has expressly said that's not enough to establish a conflict which would prevent the United States from representing a defendant in three cases, in Washington versus Daly, Southwest Center, and in Alto. Possible conflict's not enough. And that's all they've said. And that should be the end of the analysis because adequate representation ends the Rule 19 analysis. Judge Block, you raised a question about NTAC's seeming inconsistency about benefiting from this statutory scheme, but then when it's to their advantage, evoking sovereign immunity to thwart part of it. I think that's a critical point here is that they shouldn't be able to play that way with this federal scheme. Here, we're not talking about federal tribal sovereignty. As this court noted in Alto, when the decision rests ultimately with the federal government, that's not a sovereign issue for the Navajo Nation. Congress has decided that approval of a smacker permit, approval of a lease, and an easement on tribal land rests with the Department of Interior. And that's where the decision here is. They shouldn't be allowed to use Rule 19 strategically to undo federal laws. It threatens the supremacy of federal law as this court recognized in the Salt River Project, as the 10th Circuit recognized in Many Goats, as- You're over time, please wrap up. Okay. Your Honor, we just ask that you follow binding precedent, Southwest Center in Washington versus the Daly. Reverse the district court in the amend. Thank you. Thank you for your argument. DNA Citizens Against Ruining Our Environment versus Arizona Public Service Company and Navajo Transitional Energy Company, LLC is submitted. And we're adjourned for this session.
judges: Ikuta, Friedland, Block